STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Olu A. RHODES, Defendant-Appellant.

Supreme Court

*No. 2009AP25–CR. Oral argument February 3, 2011.
—Decided July 14, 2011.*

2011 WI 73

(Also reported in 799 N.W.2d 850.)

For the plaintiff-respondent-petitioner the cause was argued by *Jeffrey J. Kassel,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

For the defendant-appellant there were briefs and oral argument by *John J. Grau, Grau Law Office,* Waukesha.

¶ 1. DAVID T. PROSSER, J. This is a review of an unpublished decision of the court of appeals. *State v. Rhodes,* No. 2009AP25, unpublished slip op. (Wis. Ct. App. July 7, 2010). The court of appeals reversed a judgment of conviction entered on a jury verdict finding Olu A. Rhodes (Rhodes) guilty of first-degree intentional homicide and first-degree recklessly endangering safety, both as party to a crime, in violation of Wis. Stat. §§ 940.01(1)(a) and 941.30(1).[1]

¶ 2. On appeal, Rhodes claimed that the circuit court erred when it cut off his cross-examination of a prosecution witness—his sister, Nari Rhodes (Nari). His cross-examination sought to cast doubt on the State's theory of motive in the case, that Rhodes had killed the victim because the victim was responsible for Nari being beaten the day before the shooting. Rhodes argued that by cutting short his cross-examination, the circuit court violated his constitutional right to confront a witness, and the error was not harmless.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

¶ 3. We conclude that the circuit court did not violate the confrontation clause of the Sixth Amendment when it exercised its discretion in limiting the cross-examination of Nari Rhodes. The court reasonably limited the defendant's cross-examination of his sister about incidents of domestic abuse against her by the victim of the homicide to avoid confusing the issues and misleading the jury. This limitation did not prevent the defendant from presenting evidence to rebut the State's theory of the defendant's motive for the crime, and to make that argument in closing.

¶ 4. Accordingly, we reverse the decision of the court of appeals and remand the case to the court of appeals for consideration of the other grounds presented by the defendant.

## I. BACKGROUND AND PROCEDURAL HISTORY

¶ 5. Olu Rhodes and his brother, Jelani Saleem (Saleem), were tried together for the murder of Robert Davis (Davis) and the shooting injury of Jonte Watt (Watt) in an incident that occurred on April 4, 2006. Davis was shot seven or eight times and died from the gunshot wounds. Watt was shot in the thigh in the same incident.

¶ 6. The State's theory of the case was that Rhodes and Saleem killed Davis in retribution for a beating the day before of their sister, Nari, for which they believed Davis was ultimately responsible. Nari and Davis had previously had a tempestuous romantic relationship, and Davis fathered Nari's child.

¶ 7. The defense theory was simply that Olu Rhodes and Jelani Saleem were not involved in the shooting. The defense sought to rebut the State's motive evidence by showing that Rhodes and Saleem had

69

not avenged other, prior injuries inflicted on Nari by Davis. The trial court cut the cross-examination of Nari short on grounds that the previous injuries were extraneous "other acts" evidence and might confuse the issues.

¶ 8. During the course of the trial, the jury heard testimony from multiple witnesses including Jonte Watt, Dominique Walker, Nari Rhodes, Detective David Salazar, and Olu Rhodes. Jelani Saleem did not take the stand. Watt testified that around noon on April 4, 2006, Watt, Davis, and Dominique Walker were driving around in Watt's car when they noticed Rhodes following them in his red Buick Riviera. Watt did not testify that he recognized anyone in the car other than Rhodes. Watt stopped on 1st Street in Milwaukee to speak with a friend, then continued driving, at which point Watt no longer saw Rhodes following them. Watt drove to his grandmother's house and parked the car in front of the house.

¶ 9. As Watt and Davis were waiting on the porch of the grandmother's house, Rhodes came around the corner in his car. Watt noticed Saleem in the passenger's seat. As Watt continued to knock on his grandmother's door, Saleem and Davis ran toward them with handguns. Watt testified that he heard three shots as he and Davis fled from the porch. Watt was shot in the thigh. During the course of the shooting, Davis fell and Watt heard additional shots. Watt looked back and saw Saleem standing over Davis.

¶ 10. Walker corroborated Watt's testimony and added that she yelled to Watt that Rhodes was approaching. She testified that she saw Rhodes and Saleem running toward the porch and saw, after Davis fell, that both Saleem and Rhodes stood over him and fired additional shots, after which they ran away.

70

¶ 11. Nari Rhodes was called as a prosecution witness to support the State's theory of motive for the shooting. She testified that she had a tense argument with Davis on April 3, 2006, the day before the murder. Nari testified that Davis swore at her, damaged her car window, took her cell phone, and attempted to pull their child from the car. Later that same day, Davis flagged Nari down in her car and they resumed talking. While they were talking, Davis's then current girlfriend, Nancy Segura, came up to the car and started arguing with Nari. Davis walked away as the argument escalated, and thereafter Segura beat Nari with the help of Tammy Bell. Nari was punched, pulled from the car, and rendered unconscious after hitting her head on the concrete. She had to be taken to a hospital.

¶ 12. Nari testified that after she returned from the hospital, she told Rhodes and Saleem about the beating from Segura and Bell, but explained that her brothers did not react with anger. Rather, they were upset with Nari for putting herself in the position to be beaten by the two women.

¶ 13. Midway through her testimony, Nari alluded to previous domestic violence problems with Davis.

¶ 14. On cross-examination, Nari testified that she wanted to get back at Segura and Bell personally. When defense counsel asked Nari about the injuries she previously received from Davis, she explained that the orbital bone by her eye had been broken. At that point, the prosecution objected and a sidebar ensued. Although the initial sidebar was not on the record, Milwaukee County Circuit Judge Patricia McMahon later summarized for the record what happened during the sidebar. Judge McMahon explained that she did not want the defense to go "into each instance of alleged

71

violence from Mr. Davis" because there had already been "an opportunity for fair response," but the defense was "going into an incident by incident which really gets into other acts" evidence. Accordingly, Judge McMahon told defense counsel to move on.[2]

¶ 15. Detective Salazar testified that on the day of the shooting, he interviewed Letitia Dotson (Dotson), the mother of Rhodes' daughter, about conversations that she and Rhodes had shortly after the shooting. He testified that Dotson told him that Rhodes called her at 2:44 p.m. on April 4, 2006, just minutes after the shooting. During a second call at 3:04 p.m., Rhodes explained that he had shot Davis six times and that he did not "stick around to find out" whether Davis was dead.

¶ 16. At trial, Dotson denied making those statements to Detective Salazar. Salazar's account of the interview was corroborated, however, by the testimony of his partner, Detective Willie Huerta, who had participated in the interview. It also was corroborated by a

---

[2] Judge McMahon summarized the sidebar:

What happened at sidebar was there was questioning gone into the witness as to the injuries that she sustained as a result of Mr. Davis and there was an objection.

The Court had permitted previously reference to the fact there had been other incidents of domestic violence between her and Mr. Davis and . . . there were other issues involved, but I did stop you from going into each instance of alleged violence from Mr. Davis.

I felt that . . . We talked about this before on the record and I thought that there was an opportunity for fair response to raising it and—and it was raised. We were going to avoid it altogether, but it was raised, and I gave opportunity for fair response, but what you were doing was going into a[n] incident by incident which really gets into other acts and things that were not—there was no motion and there was no order to admit that.

report Huerta prepared the day of the interview. Furthermore, the State presented two witnesses who testified about the use of a cell phone belonging to Saleem. An employee of Sprint Nextel presented cell phone records that documented the calls made from Saleem's phone. In addition, a criminal intelligence analyst from the Department of Justice took the call location and time information provided by Sprint and plotted it on a map to show Rhodes had been in the vicinity of the location of the shooting.

¶ 17. Rhodes chose to take the stand and testified that he did not shoot Davis or Watt. He explained that, while it was true he drove a Buick Riviera, on the day of the shooting he had been driving around trying to buy marijuana. He stated that he was aware for at least a year prior to the shooting that Robert Davis was physically abusing Nari. Rhodes testified that when he first found out about the abuse, he had a physical confrontation with Davis in which he and his cousins threw Davis out of the house. He said he had no further physical confrontations with Davis, that he eventually "left it alone" because he saw that his sister kept going back to Davis after Davis had physically abused her.

¶ 18. The jury found Rhodes guilty of the respective charges of first-degree intentional homicide and first-degree recklessly endangering safety in violation of Wis. Stat. § 940.01(1)(a) and 939.05, but it acquitted Saleem.

¶ 19. Rhodes appealed his conviction on four grounds. Rhodes argued that the trial court denied him his right to confrontation when it limited his cross-examination of Nari Rhodes; the Department of Justice analyst was not qualified to give expert testimony about the operation of cell phone towers; the prosecutor impermissibly argued in his closing argument that

phone records placed Rhodes at the scene of the crime; and the circuit court erroneously exercised its discretion when it determined that one of Watt's prior convictions would be excluded from the number of convictions that would be counted for impeachment purposes. The court of appeals reversed both of Rhodes' convictions on the first ground, concluding that the trial court erred when it limited Rhodes' cross-examination of Nari. It did not address the other grounds raised.

¶ 20. The State petitioned this court for review, which we granted on September 24, 2010.

## II. STANDARD OF REVIEW

¶ 21. The State's appeal requires us to determine whether the circuit court properly exercised its discretion in limiting Rhodes' cross-examination of Nari.

¶ 22. Limiting cross-examination is limiting the introduction of evidence. A circuit court's decision to admit or exclude evidence will be viewed as a proper discretionary determination so long as it was made "in accordance with accepted legal standards and in accordance with the facts of record." *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983) (citing *State v. Wollman*, 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979)). To this end, we consider whether the circuit court "reviewed the relevant facts; applied a proper standard of law; and using a rational process, reached a reasonable conclusion." *State v. Davidson*, 2000 WI 91, ¶ 53, 236 Wis. 2d 537, 613 N.W.2d 606 (citing *State v. Sullivan*, 216 Wis. 2d 768, 780–81, 576 N.W.2d 30 (1998)).

¶ 23. In the context of a constitutional challenge to limitations on cross-examination, the United States Supreme Court has observed, "[T]rial judges retain

74

wide latitude insofar as the Confrontation Clause is concerned to impose limits on cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). In keeping with this holding, we review such decisions for an erroneous exercise of discretion. *See State v. Jackson*, 216 Wis. 2d 646, 655, 575 N.W.2d 475 (1998); *State v. McCall*, 202 Wis. 2d 29, 41–42, 549 N.W.2d 418 (1996); *State v. Echols*, 175 Wis. 2d 653, 677, 499 N.W.2d 631 (1993); *Rogers v. State*, 93 Wis. 2d 682, 689, 287 N.W.2d 774 (1980).

¶ 24. The court has, on occasion, articulated the standard of review somewhat differently. In *State v. Williams*, the court stated, "Although a circuit court's decision to admit evidence is ordinarily a matter for the court's discretion, whether the admission of evidence violates a defendant's right to confrontation is a question of law subject to independent appellate review." *State v. Williams*, 2002 WI 58, ¶ 7, 253 Wis. 2d 99, 644 N.W.2d 919.

¶ 25. The standard described in *Williams*, although articulated differently from the standard in *Van Arsdall*, results in the same analysis set forth in *McCall* —that is, a reviewing court should reverse the circuit court if it determines that the discretionary decision to limit cross-examination did not rely on the appropriate and applicable law. *McCall*, 202 Wis. 2d at 36 & n.5 (citing *Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981)). The appropriate and applicable law in this context is, of course, the constitutional right accorded under the confrontation clause. Whether the circuit court relied on the appropriate and applicable law is, by definition, a question of law that we review de novo. *See City of Madison v. Wis. DWD*, 2003 WI 76, ¶ 10, 262 Wis. 2d 652, 664 N.W.2d 584.

[A] trial court in an exercise of its discretion may reasonably reach a conclusion which another judge or another court may not reach, but it must be a decision which a reasonable judge or court *could* arrive at by the consideration of the relevant law, the facts, and a process of logical reasoning.

*Hartung,* 102 Wis. 2d at 66 (emphasis added).

█

¶ 26. A reviewing court may not substitute its discretion for that of the circuit court. *McCall,* 202 Wis. 2d at 42. An appellate court may, however, review the record independently to determine whether there is any reasonable basis for the circuit court's discretionary decision. *Davidson,* 236 Wis. 2d 537, ¶ 53.

### III. ANALYSIS

¶ 27. To address the issues presented, we consider first the history of the confrontation clause, the scope of its application, and its development in the context of cross-examination. We next review a circuit court's discretion to exclude relevant evidence under Wis. Stat. § 904.03,[3] including testimonial evidence in the context of cross-examination and the confrontation clause. We then apply these principles of law to the facts of this case.

### A. Confrontation Clause

¶ 28. The Sixth Amendment to the United States Constitution provides in part that, "In all criminal prosecutions, the accused shall enjoy the right . . . to be

---

[3] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

confronted with the witnesses against him." This right has been applied to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 406 (1965). The Wisconsin Constitution similarly provides: "In all criminal prosecutions the accused shall enjoy the right . . . to meet the witnesses face to face." Wis. Const. art. I, § 7. We have observed that these provisions are "generally" coterminous, and thus we apply United States Supreme Court precedent in our analysis of these clauses. *State v. Hale*, 2005 WI 7, ¶ 43, 277 Wis. 2d 593, 691 N.W.2d 637.

■■

¶ 29. The Supreme Court has held that the "main and essential purpose" of the confrontation clause is to give the accused an opportunity to cross-examine the witnesses against him. *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974) (quoting 5 J. Wigmore, *Evidence* § 1395, p. 123 (3d ed. 1940)). The right to cross-examine is often implicated in the context of an accused's attempt to test the credibility of an adversary witness. *See Van Arsdall*, 475 U.S. at 678–79; *Davis*, 415 U.S. at 316–17. At the most fundamental level, the right to confrontation through cross-examination allows the accused to test the "believability of a witness and the truth of his testimony." *Davis*, 415 U.S. at 316. *See also Crawford v. Washington*, 541 U.S. 36, 61 (2004) (the confrontation clause is intended to allow the reliability of testimony to be assessed "by testing in the crucible of cross-examination").

¶ 30. In *Davis* the Supreme Court considered a case in which the trial court allowed some cross-examination of a prosecution witness, but did not allow defense counsel to question the witness on his probation status at the time of the events to which he was testifying. *Id.* at 313–14. The Supreme Court held that

77

the defendant's right to confrontation was violated when he was prevented from cross-examination that might "expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.* at 318.

¶ 31. Similarly, in *Van Arsdall,* the Supreme Court concluded that the circuit court improperly curtailed all inquiry into the dismissal of a pending public drunkenness charge against one of the prosecution's witnesses. *Van Arsdall,* 475 U.S. at 679. The Court rejected the State's suggestion that a defendant must show " 'outcome determinative' prejudice," *id.,* to present a confrontation clause violation, holding instead that:

> [T]he focus of the Confrontation Clause is on individual witnesses. Accordingly, the focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial. . . . We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness.

*Id.* at 680.

■

¶ 32. The right to cross-examination, and thereby confrontation, is not, however, absolute. *Id.* The *Van Arsdall* Court rejected the suggestion that any confrontation clause violation must result in automatic reversal. *Id.* Instead, the Court reaffirmed and applied the *Chapman v. California,* 386 U.S. 18 (1967), harmless error standard to confrontation clause cases, and re-

manded the case to the Delaware Supreme Court for a determination of prejudice. *Van Arsdall,* 475 U.S. at 680, 684.

¶ 33. The harmless error test, as the Court explained, is focused on "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* at 684. The factors to be considered in such an analysis include the importance of the witness's testimony, whether the testimony was cumulative, whether other evidence corroborated or contradicted the witness's testimony, the extent of the cross-examination allowed, and the overall strength of the prosecution's case against the defendant. *Id.; see also Harrington v. California,* 395 U.S. 250, 250 (1969) (holding that the defendant's inability to cross-examine his co-defendants who chose not to take the stand was harmless error).

¶ 34. Because the right to cross-examination is not absolute, the right to confrontation may be limited where necessary to further an important public policy, so long as there are means to assure the reliability of the witness's testimony. *Maryland v. Craig,* 497 U.S. 836, 850 (1990).

¶ 35. In *Craig,* the important public policy concern was the protection of the "physical and psychological well-being" of children. *Id.* at 852–56. The defendant in *Craig* was charged with sexually assaulting a six-year-old girl. *Id.* at 840. The trial court, on motion by the state, limited receipt of the child's testimony to one-way closed circuit television, outside the physical presence of the defendant. *Id.* The Supreme Court concluded that if it is "the presence of the defendant

that causes the [courtroom] trauma," a court may properly deny a defendant the right to face-to-face confrontation. *Id.* at 856.

¶ 36. Similarly, courts have upheld limitations on cross-examination by a pro se defendant of a child witness in a sexual abuse case, *Fields v. Murray,* 49 F.3d 1024, 1034–37 (4th Cir. 1995); limitation on cross-examination about a witness's history of mental illness when the accused had been permitted to explore the issue outside the presence of the jury and was allowed to cross-examine the witness on his drug and alcohol history, *U.S. v. Jones,* 213 F.3d 1253, 1261 (10th Cir. 2000); and use of strongly corroborated testimony from the defendant's first trial, instead of presenting live testimony at the second trial, *Lowery v. Anderson,* 225 F.3d 833, 839–41 (7th Cir. 2000).

¶ 37. The Supreme Court also has recognized that the confrontation clause does not guarantee cross-examination "that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985). Although the witness in *Fensterer* could not recall the particular basis upon which he had made his expert opinion, the confrontation clause was satisfied because the defense was given a full opportunity to expose his forgetfulness. *Id.* at 21–22. That the defense might have preferred that the expert "embrace a particular theory, which it [was] prepared to refute with special vigor, is irrelevant." *Id.* at 19. The confrontation clause guarantees only the *opportunity* to cross-examine witnesses. *Id.* at 20.

¶ 38. In addition, the right to cross-examination extends only to evidence that is relevant. We have long recognized that a defendant has no right, "constitutional or otherwise," to present evidence on cross-

examination that is not relevant. *See State v. Robinson,* 146 Wis. 2d 315, 332, 431 N.W.2d 165 (1988); *State v. Bolstad,* 124 Wis. 2d 576, 584, 370 N.W.2d 257 (1985); *see also State v. Droste,* 115 Wis. 2d 48, 58, 339 N.W.2d 578 (1983). The test of relevancy on cross-examination "is not whether the answer will elucidate any of the main issues in the case but whether it will be useful to the trier of fact in appraising the credibility of the witness and evaluating the probative value of the direct testimony." *Rogers,* 93 Wis. 2d at 689.

¶ 39. As the Supreme Court explained in *Van Arsdall,* the right of cross-examination does not mean

> that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Van Arsdall,* 475 U.S. at 679.

¶ 40. Accordingly, we have upheld limitations on cross-examination when the circuit court properly exercises its discretion to preclude evidence that is "irrelevant or immaterial," "designed to confuse the issues in the instant case, and interject undue prejudice into the jury's decision making process." *McCall,* 202 Wis. 2d at 44–45.

B. Exclusion Of Evidence Under Wis. Stat. § 904.03

¶ 41. Wisconsin Stat. § 904.03 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

¶ 42. "Relevant evidence" is defined in Wis. Stat. § 904.01 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evidence need not bear directly on one of the elements of the crime in order to be admissible, but may bear on another "fact that is of consequence" to the determination of the action. *Holmes v. State,* 76 Wis. 2d 259, 268, 251 N.W.2d 56 (1977).

¶ 43. In *Holmes,* the factor of consequence was motive. *Id.* The defendant was charged with armed robbery, to which he pleaded guilty, and attempted murder, to which he pleaded not guilty. *Id.* at 262. The two charges stemmed from the same incident. *Id.* The prosecution sought and was allowed to present evidence regarding the armed robbery to show the defendant's motive for running away from police and firing shots at the officer. *Id.* at 264. On appeal, the defendant argued, among other things, that the evidence was irrelevant and inadmissible. *Id.* at 266. This court disagreed, holding: "There can be no question that evidence relating to the armed robbery was relevant to the issue of the attempted murder charge, in that it provided the motive for the shooting." *Id.* at 267. The circuit court properly exercised its discretion under § 904.03 because it engaged in a balancing of the probative value against the chance of undue prejudice to the defendant. *Id.* at 270.

82

¶ 44. We apply the same analysis to discretionary decisions when the defendant's right to cross-examination under the confrontation clause may be implicated.

¶ 45. For example, in *McCall*, the defendant claimed his constitutional right to confront his accusers was violated when the circuit court limited his cross-examination of the victim. *McCall*, 202 Wis. 2d at 32. The circuit court refused to allow cross-examination of the victim regarding the dismissal of three criminal charges that had been pending prior to the victim's testimony. *Id.* We reiterated that the extent and scope of cross-examination is committed to the sound discretion of the circuit court, and that reversal is proper only where there has been a "prejudicial abuse of discretion." *Id.* at 35.

¶ 46. We then concluded that the court of appeals erred when it substituted its discretion for that of the circuit court. *Id.* at 42. We specifically noted that the circuit court, prior to its decision to restrict the scope of cross-examination, heard arguments from both counsel and demonstrated a logical reasoning process when it balanced the relevancy of the evidence against the danger of unfair prejudice and confusion of the issues. *Id.* at 39.

¶ 47. We also found significant the fact that the record indicated the defendant was able to present other evidence to give the jury reason to discredit the victim's testimony. *Id.* at 41. We concluded that, "[a]lthough a defendant is entitled to significant latitude" in cross-examination, the circuit court has a duty to place limits on such examination when it would "divert the trial to extraneous matters or confuse the jury by placing undue emphasis on collateral issues." *Id.* at 41–42. Because the testimony sought was not relevant,

the defendant's Sixth Amendment right to confrontation was not implicated. *Id.* at 43.

¶ 48. In sum, we have consistently balanced a defendant's right to cross-examination under the confrontation clause against the circuit court's discretionary authority to exclude evidence that may lead to confusion of the issues or confusion of the jury. *See State v. Hammer,* 2000 WI 92, ¶¶ 42–43, 236 Wis. 2d 686, 613 N.W.2d 629; *Echols,* 175 Wis. 2d at 677; *Rogers,* 93 Wis. 2d at 689, 692.

## C. Rhodes' Appeal

¶ 49. Rhodes' chief argument is that he should have been allowed to cross-examine Nari to rebut the State's theory of motive—namely, that Rhodes and Saleem gunned down Davis, and in the process also shot Watts, in an attempt to avenge the beating Nari had incurred at Davis's alleged direction. Rhodes argues that to effectively rebut the State's theory, he should have been allowed to cross-examine Nari regarding the previous incidents of domestic violence at Davis's hand that the brothers had not avenged. To be denied this opportunity, he contends, violated his Sixth Amendment right to cross-examination.

¶ 50. "The exposure of a witness's motivation in testifying represents 'a proper and important function of the constitutionally protected right of cross-examination.' " *McCall,* 202 Wis. 2d at 45 (Abrahamson, J., dissenting) (quoting *Davis,* 415 U.S. at 316–17).

¶ 51. Here, however, Rhodes is attempting to use a State witness to rebut the State's theory of the *defendant's* motivation, even though Nari had provided

little support for the State's theory in her testimony. If Rhodes had attempted to challenge the motivation or *credibility* of Nari through cross-examination, we might have a different case.

¶ 52. On direct examination, Nari detailed her beating on April 3 by Segura and Bell. She insisted that Rhodes and Saleem did not become angry at Davis, but instead took her beating calmly, and were "mad" at her for putting herself "in the predicament to be beaten."

¶ 53. In response to a question from the assistant district attorney about her relationship with Davis after the birth of their son, Nari blurted out that "we had a lot of domestic violence problems." The prosecution did not pursue this answer, but Rhodes' defense counsel seized upon it in cross-examination. Rhodes' attorney asked:

Q: You did tell us . . . on direct examination that there had been domestic violence or violence between yourself and Davis before, right?

A: Yes.

Q: Before that date?

A: Yes.

Q: In fact, Mr. Davis had attacked you previous to April 3, 2006; is that right?

A: Yes.

. . . .

Q: [I]n your conflict with Mr. Davis, have there been other times when you've been injured?

A: Yes.

Q: And what injuries had you received?

A: One side—My orbital bone *in my eye* was broken and it was like really bad. (Emphasis added.)

¶ 54. This is where the State objected and the court called a sidebar. The court blocked further questions on the subject. In the subsequent comment about the sidebar, defense counsel said:

> I asked Nari Rhodes about a particular incident. She said her orbital bone had been broken. That's a fairly serious injury. My next question would have been, well, what's your orbital bone? The question—She would have described as something around her eye.[4]
>
> After that I would have asked her did she make her brothers aware of that injury and who would have inflicted it and she would have said yes.[5] There was no response from her brothers.
>
> That was proper for me to try and rebut this motive information that the State has come forward with.

¶ 55. The State objected that it did not have notice of that particular incident and said it had expressed concern before any evidence was introduced that the defense would make "a history of domestic abuse" by Davis an issue.

¶ 56. Judge McMahon stated that this possibility had been a concern from the beginning, which is why the court had made an initial "ruling that we not get

---

[4] Nari Rhodes had already linked the "orbital bone" to her eye in her testimony.

[5] Nari Rhodes had already testified that Olu Rhodes had lived with his mother and sister for a number of years, which would have included the time when Nari sustained the orbital bone injury.

into evidence—extraneous evidence that would mislead the jury on other issues in a trial within a trial which is the concern."

■■ ■■

¶ 57. Motive is not an element of either first-degree intentional homicide or first-degree recklessly endangering safety, the charges brought by the State against Rhodes and Saleem. *See* Wis. Stat. §§ 940.01(1)(a) and 941.30(1) (2005–06). The State made motive a fact of consequence, however, when it asserted that there was "bad blood" between Davis and Rhodes because of Davis's abuse of Nari.

■■■

¶ 58. The testimony Rhodes sought to elicit by cross-examining Nari went to rebut motive, which was made a fact of consequence by the State. Therefore, the testimony sought by Rhodes would have been relevant under Wis. Stat. § 904.01.

¶ 59. Nonetheless, the circuit court permissively exercised its discretion in curtailing a full inquiry into prior incidents between Davis and Nari. Wis. Stat. § 904.03.

¶ 60. As discussed above, one of the grounds for exclusion of relevant evidence under § 904.03 is the danger of "confusion of the issues." Another is the risk of "misleading the jury." *Id.* Judge McMahon referenced both in her decision at sidebar to limit Nari's testimony on cross-examination.[6]

---

[6] Rhodes' brief spends much time arguing that Nari's testimony should not have been excluded as "other acts evidence" under *State v. Sullivan,* 216 Wis. 2d 768, 771–73, 576 N.W. 2d 30 (1988). While counsel argued during the sidebar on the record about whether or not a *Sullivan* analysis should apply to any prior assaults on Nari by Davis, Judge McMahon did not pin her

¶ 61. Judge McMahon's concerns were not without reasonable basis. This case already involved two defendants, only one of whom testified. Over the course of the four-day trial, testimony was taken from sixteen witnesses, including Watts, the surviving victim of the crime. The jury was already presented with the difficult task of taking the often-conflicting testimony it heard and weighing it on two charges against two separate defendants.

¶ 62. Judge McMahon was concerned that the jury would be misled into an improper focus on questions about motive and the alleged history of abuse between the victim and Nari. There was also the possibility that if Rhodes were allowed to emphasize his rebuttal theory he would not have retaliated against Davis for the April 3 incident because he had not retaliated against him before, he would have confused the issues. First, such testimony would, in effect, have put Davis—the deceased victim—on trial for alleged prior incidents of domestic violence.[7] Second, it would have required the jury to speculate as to whether a lack of retaliation for Davis's prior assaults on Nari magnified Rhodes' motive in this instance. Both were legitimate concerns.

¶ 63. At the same time, Judge McMahon was clearly mindful of the importance of allowing Rhodes to rebut the State's theory of motive. Both Nari and Rhodes were allowed to present their side of the story to rebut the State's theory of motive. The jury could reasonably have viewed their testimony as contradicting the State's theory.

---

ruling to limit cross-examination on "other acts" evidence. Instead, she emphasized the factors listed in Wis. Stat. § 904.03.

[7] Wisconsin Stat. § 904.03 lists "unfair prejudice" and "misleading the jury" as two of the factors justifying the exclusion of evidence.

¶ 64. If anything, Nari's testimony seemed to refute the State's theory of motive, because she testified that she and Davis had a friendly relationship, and that Davis repeatedly warned her to leave the scene when Segura arrived and became angry. Nothing in her testimony suggested that she believed Davis orchestrated the beating she received at the hands of Segura and Bell. According to her testimony, Nari told her brothers that the two women were responsible, not Davis, and that the brothers took the news calmly. Counter to the State's theory that Rhodes and Saleem believed Davis was responsible, Nari testified that her brothers were upset that she had put herself in the situation because of the bad blood between Nari and Segura, not between Nari and Davis.

¶ 65. Rhodes, in turn, testified that he was aware of the history of domestic violence by Davis against Nari, and that when he initially discovered the abuse, he threw Davis out of the house. He then proceeded to explain that as time went on, he saw that Nari continued to return to Davis despite the abuse, and he "just left it alone." As he observed, "She is grown up, so I couldn't tell her what to do."

¶ 66. Both Rhodes and Nari were allowed to present their side of the story. There is no indication that this story would have been more persuasive if Nari had been allowed to testify that there was no retaliation after the incident when Davis assaulted her and broke her orbital bone. Rhodes, in fact, testified that he had done no more on any occasion than throw Davis out of the house. In the end, the jury was required to make a determination of credibility as to the testimony presented. If the jury did not accept Rhodes' and Nari's explanation that her brothers had given up in frustration when she continued to return to her abuser—an

argument made by defense counsel in his closing—the additional statement that they did not seek revenge after the orbital bone incident was not likely to persuade them otherwise.

¶ 67. The circuit court was faced with a difficult dilemma, one that required a delicate balance between Rhodes' constitutional rights on one hand and the dangers of confusion of the issues and misleading the jury on the other. The statements of record show that the court considered arguments by all counsel, and then proceeded to demonstrate a logical reasoning process when it applied the Wis. Stat. § 904.03 balancing test, just as the court did in *McCall*, 202 Wis. 2d at 39. There is no evidence of an erroneous exercise of discretion.

¶ 68. As we have already discussed, the right to cross-examination under the confrontation clause is not absolute. *See Van Arsdall*, 475 U.S. at 679. Whether they are faced with the danger of undue prejudice or the specter of psychological trauma to victims, circuit courts can weigh the probative value of the evidence proffered with the dangers it brings. The United States Supreme Court and our case law provide examples of when the right to confrontation must bow to other considerations. Wisconsin Stat. § 904.03 provides circuit courts guidance on how to balance these competing concerns. At the end of our analysis, the question is not whether we would have drawn the line the same as the circuit court did, but whether the circuit court's line-drawing was a reasonable exercise of its discretion.

¶ 69. In this instance, the record supports the conclusion that Judge McMahon's decision was the product of a logical process of reasoning, applying the correct standard of law to the facts of the case. Rhodes' right to cross-examination under the confrontation

clause was not violated when the court limited his cross-examination of his sister, Nari.[8]

¶ 70. Accordingly, we reverse the decision of the court of appeals and remand the case to the court of appeals for its consideration of the other grounds presented by the defendant.

## IV. CONCLUSION

¶ 71. The record shows that Judge McMahon applied a proper standard of law in the exercise of her discretion, and it is not our place to substitute our judgment for hers. We hold that Rhodes' constitutional right to cross-examination under the confrontation clause was not violated when the court limited Nari's testimony. The decision of the court of appeals is reversed.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the court of appeals for further proceedings consistent with this opinion.

¶ 72. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). A criminal defendant's fundamental right to confront witnesses is a central tenet of our system of justice, our process of truthfinding, and our concepts of fair trial.

¶ 73. Although the circuit court has wide latitude in excluding evidence, the criminal defendant's fundamental constitutional right in the present case to confront a witness through cross-examination was unconstitutionally truncated.

---

[8] Because we conclude that the circuit court did not err in limiting the cross-examination of Nari's testimony regarding her prior incidents of abuse, we do not reach the question of harmless error.

¶ 74. The State emphasized a retaliation motive theory throughout the prosecution of this case. In opening argument, throughout testimony, and in closing argument, the State's story of the case was that these brothers hunted down the victim in retaliation for their sister's beating of the day before. The State called Nari Rhodes to testify against the defendant for the purpose of establishing this motive theory.

¶ 75. The defendant had a fundamental constitutional right to confront this witness and test the probative value of the testimony through cross-examination.

¶ 76. I agree with Judge Fine, writing for the court of appeals, who balanced the circuit court's latitude in excluding evidence and the defendant's constitutional right as follows:

> Here, although we acknowledge the trial court's "wide latitude," Rhodes's constitutional right to cross-examine was cut off too soon. As we have seen, the State emphasized the defendant's motive to avenge his sister's beating in its opening, during the testimony, and in its closing. The argument was that when Rhodes found out Davis had his sister beaten, he "hunted Davis down" and killed him. The trial court truncated Olu A. Rhodes's lack-of-motive defense when it stopped him from proving he did not react violently when Davis had earlier hurt his sister. Although, as the State argues, the jury *could have* concluded that the beating that the State contends gave Olu A. Rhodes the motive to kill Davis in this case was the last straw and that the earlier *incidents contributed to what the State asserted was* Olu A. Rhodes's and Saleem's rage, the jury could have also reached the conclusion advanced by Olu A. Rhodes's lawyer. This was, therefore, a matter that the jury had to resolve, and it needed to have a full picture of the dynamics that roiled the relationships in this

case. By cutting off the cross-examination of Nari Rhodes when Olu A. Rhodes's lawyer was trying to rebut the State's motive theory, the trial court deprived Olu A. Rhodes of his constitutional right to a fair trial.

*State v. Rhodes,* No 2009AP25, unpublished slip op., ¶ 10 (Wis. Ct. App. July 7, 2010) (emphasis in original).

¶ 77. The majority presents numerous examples of situations in which it has been determined that it was reasonable to limit a defendant's ability to confront or cross-examine a witness. Majority op., ¶¶ 35–40.

¶ 78. I agree that the defendant's fundamental right to cross-examine a witness is not absolute or unlimited. A circuit court may impose *reasonable* limitations on a defendant's cross-examination *when necessary,* balancing competing interests.

¶ 79. The majority states that the appropriate analysis in reviewing the circuit court's determination regarding whether a limitation of the defendant's fundamental constitutional right was reasonable and necessary is the same analysis that is applied in reviewing any discretionary evidentiary decision of the circuit court. Majority op., ¶ 44. The majority analogizes the appropriate discretionary determination for limiting the defendant's fundamental constitutional right to confront a witness to the balancing of the probative value against the chance of undue prejudice to the defendant that the circuit court must perform in determining whether to allow the prosecution to present evidence. Majority op., ¶¶ 43–44.

¶ 80. A defendant's fundamental constitutional right of confrontation surely affords the defendant more protection and leeway in cross-examining a witness than the standard analysis used in discretionary evidentiary decisions when a fundamental constitu-

93

tional right is not implicated. Indeed, in *State v. St. George,* 2002 WI 50, ¶ 38, 252 Wis. 2d 499, 643 N.W.2d 777, in which the defendant argued that his constitutional right to present a defense was violated through the exclusion of an expert witness, the court ruled: "One, the circuit court must adhere to the evidentiary rules applicable to expert witnesses, and two, because the defendant asserted that the exclusion of the evidence would violate his constitutional right to present a defense, the circuit court must consider the constitutional law principles in making its evidentiary ruling."

¶ 81. A similar two-fold legal analysis is applicable in the present case, in which the defendant asserts that the exclusion of evidence in cross-examination violates his constitutional right to confrontation.

¶ 82. In the present case, I conclude that the circuit court's limitation was not reasonable or necessary in light of the defendant's offer of proof, the competing interests examined by the circuit court, and the defendant's fundamental constitutional right.

¶ 83. For the reasons set forth, I dissent.

¶ 84. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.